1998 OK 98

**Tommy LUCAS, Petitioner,**

v.

**TRIAD DRILLING COMPANY, National Union Fire Insurance, and The Workers' Compensation Court, Respondents.**

**No. 89075.**

Supreme Court of Oklahoma.

Oct. 13, 1998.

Rehearing Denied Dec. 17, 1998.

**364** ■

Duke Halley, Woodward, for Petitioner.

Greg James, Oklahoma City, for Respondents.

WATT, J.

¶ 1 The workers' compensation claim from which this appeal arose involved an injury sustained by Tommy Lucas when the driver of a pickup truck in which Lucas was a passenger lost control of the pickup and wrecked it. The driver of the pickup was killed, and Lucas, who had been riding in the bed of the truck with another passenger, was paralyzed from the mid-chest down.

## FACTS

¶ 2 The relevant facts are undisputed. Lucas worked as a "floorhand" on drilling rigs for Triad Drilling Company. On the day he was injured, June 14, 1995, Lucas had worked on a drilling rig located about ninety miles from his home in Woodward. Lucas normally worked a twelve hour shift (known as a "tour" in the oil fields), and then got twenty-four hours off. He had completed a twelve hour tour at 6:00 p.m. the day before

the accident, June 13, and was not scheduled to start a new tour until 6:00 p.m. on June 14.

¶ 3 At about 8:00 a.m. on June 14, Triad's safety superintendent, Jim Lemaster, called Lucas and asked if Lucas could work the rest of the tour that had started at 6:00 a.m. and Lucas agreed to do so. Lemaster explained that the crew then working at the rigsite was a man short, having only three men instead of the customary four.

¶ 4 The record reflects that three people can handle all required duties on a drilling rig unless they are required to "trip" pipe, which requires four crewmen. Pipe tripping involves pulling drill pipe out of the hole being drilled in order to replace the drill bit, and then putting the pipe back in the hole in order to continue drilling with the new bit. Shortly after they reported to work at 6:00 a.m., the three regular members of the crew on duty the morning of June 14, learned that they would have to trip pipe that day. At about 7:00 a.m., the three crewmen on the job informed Jim Lemaster that they needed a fourth hand. Lemaster then called Lucas.

¶ 5 Lucas had told his supervisors that he would be willing to work extra time whenever he was needed but before Lemaster called him on June 14 Lucas had not been asked to do so in the year-and-a-half he had worked for Triad. Lemaster arranged for a Triad toolpusher, Bob Brookhart, to pick up Lucas at Lucas's house and take him to the rigsite in a Triad company pickup truck.[1]

¶ 6 Brookhart and the other toolpushers worked a schedule of forty-eight hours on and forty-eight hours off, and Brookhart was going to the rigsite to relieve another toolpusher. Lucas and Brookhart arrived at the rigsite at about 11:00 a.m. and Lucas worked the rest of the tour, which ended at 6:00 P.M. Lucas was paid for the entire twelve hour tour although he actually worked only about seven hours. Lucas offered to work the oncoming shift with his regular crew, but his supervisors told him he would not be needed.

¶ 7 Lucas arranged to ride home with the three crewmen with whom he had worked

---

1. Lemaster's and Lucas's versions of their discussion concerning travel arrangements differ modestly. Lemaster testified that Lucas told him he could be ready to drive to the rigsite in half-an-hour, and Lemaster replied, jokingly he claimed, that the toolpusher, Brookhart, could pick Lucas up in ten minutes. According to Lemaster, Lucas agreed, and rode with Brookhart to the rigsite. Lucas's testimony was that he asked Lemaster how he was to get to the well site, and Lemaster said that Brookhart would pick Lucas up and take him there.

that day in a pickup owned by one of them. Lucas rode in the bed of the truck with one of the other crewmen. The other two crewmen rode in the cab. They stopped at a convenience store and bought beer on the way home. Lucas had one bottle of beer. A few minutes after they had bought the beer, the driver lost control of the pickup, it crashed, killing him and injuring Lucas. Respondents concede that "intoxication of either the driver or the Claimant ... was not an issue."

¶ 8   Triad's job description for floorhands, a copy of which Lucas acknowledged receiving, included among a floorhand's "Major Functional Responsibilities" the obligation to "Provide necessary transportation to and from work." Under ordinary circumstances, the language of Triad's job description for floorhands would insulate Triad from liability under the Workers' Compensation Act for injuries occurring on the way to or from Lucas's place of employment.

## ISSUE

¶ 9   The issue here is whether Lucas was relieved of Triad's description of his job, and the general rule, that injuries occurring while going to or coming from an employers premises are not covered by the Workers' Compensation Act because Lucas was performing a "special task" for Triad. We hold that the undisputed facts show that Lucas was engaged in a special task for Triad at the time of his injury on June 14, 1995, and was, therefore, entitled to compensation for those injuries.

## DISCUSSION

■ ¶ 10   We have considered on several occasions the "special task" exception to the general rule that injuries occurring on the way to or from an employee's place of work are not compensable. To receive compensation under the Workers' Compensation Act, a worker's injury must be one "arising out of and in the course of his employment." 85 O.S. Supp.1993 § 11. In determining wheth-

er Lucas's injury was covered by the Workers' Compensation Act we note that "this Court has repeatedly held that workers' compensation laws must be liberally construed in favor of injured employees." [Citations omitted.]   *Wal–Mart Stores, Inc. v. Switch,* 1994 OK 59 ¶ 5, 878 P.2d 357.

■ ¶ 11   In *Thurston Chemical Company v. Casteel,* 1955 OK ——, 285 P.2d 403, Syllabus by Court No. 1, we delineated the special task exception:

> The general rule that an injury suffered by an employee while on his way to or from his regular work does not arise out of and in the course of his employment does not apply where the employee sustains an accidental injury while going to or returning from his place of work to perform a special task outside of his regular hours at the request of his employer and for the employer's benefit.

(Cited with approval, *Impson v. Dillard's Brown–Dunkin Co.,* 1971 OK ——, 489 P.2d 483, 484.)

¶ 12   In *Stroud Municipal Hospital v. Mooney,* 1996 OK 127, 933 P.2d 872, Mooney, a lab worker in a hospital, was called at home on his lunch break to return to work to perform blood tests. On his way back to the hospital Mooney was injured in an automobile accident. We held that Mooney's accidental injury was covered by the Workers' Compensation Act under the special task exception because, "The special-task mission, begun under the employer's direction during claimant's off-the-premises lunch break, subjected him to the roadway hazards in action." [Emphasis deleted.]   *Mooney,* (Opala, J.'s concurring opinion, ¶ 6).[2]

¶ 13   We find nothing significant to distinguish the case at bar from *Mooney,* or the other cases in which we have applied the special task exception. Here, Lucas was called at home, agreed to return to work on short notice, and was provided company transportation to the rigsite because of the exigent circumstances created by the need for another crew member. Once Triad fur-

---

2.   We have applied the special task exception on several other occasions: *Oklahoma Natural Gas Company v. Williams,* 1981 OK 147, 639 P.2d 1222 (employee injured on the way to pick up a baby sitter so that he and his wife could attend his employer's "command performance" Christ-

mas party); *Dawson v. Oklahoma City Casket Company,* 1958 OK ——, 322 P.2d 642 (employee who had worked late unloading coal for his employer was injured when struck by a car after riding home with his foreman); *City of Edmond v. Monday,* 1995 OK 132, 910 P.2d 980 (employ-

nished transportation to Lucas to the rigsite to work an extra tour, it could no longer say that Lucas's ninety-mile return trip to his home was his personal responsibility. That the other three passengers in the pickup were traveling on their own time because they had worked their regular tour did not serve to place Lucas in their category.

¶ 14 Whether the special task exception applies is ordinarily a question of fact. *Mooney* at ¶ 8. Here, however, the facts necessary to establish the special task exception are undisputed. Thus, the failure of the Workers' Compensation Court to apply the special task exception in the face of undisputed facts that Lucas was performing a special task, was an error of law, not one of fact.

¶ 15 In *Fudge v. University of Oklahoma*, 1983 OK 67, 673 P.2d 149, the claimant was injured while crossing the street between the building in which she worked and the employer furnished parking lot where she parked her car. We reversed the Workers' Compensation Court, which had held, as it did in the case at bar, that the claimant's injury was non-compensable. There as here the Workers' Compensation Court held that the claimant's injury was not one arising out of and in the course of claimant's employment. We reversed the Workers' Compensation Court in *Fudge* because "The facts are undisputed that . . . as a matter of necessity [claimant] had to cross Felgar Street in order to reach her car parked in an employer-provided area." Thus, we held that Fudge's injuries "were clearly the result of activity arising out of and in the course of her employment." *Fudge* at ¶ 7.

¶ 16 In *Christian v. Nicor Drilling Co.*, 1982 OK 76, 653 P.2d 185, we reversed the Workers' Compensation Court because it had denied benefits to two brothers who were oil field workers; one of the brothers was killed and the other injured when they had an accident while driving their car to their job. The employer usually furnished transportation with the brothers' driller-supervisor but on the day of their accident the brothers had driven their own car because they were late for their ride with their driller-supervisor. In reversing the Workers' Compensation Court with instructions to find that at the time of their accident the brothers were within the course of their employment we said,

> Once an employer has acknowledged a need to provide his personnel with transportation, it matters little what method is chosen so long as the means of conveyance used are within the contemplation of both the employer and the employee.

[Footnote omitted.] *Nicor* at ¶ 5

¶ 17 The language quoted from *Nicor* applies here as well. By furnishing transportation to the rigsite for Lucas, Triad acknowledged that it was responsible for his return trip home. The conclusion that Lucas's injuries on his return trip arose "out of and in the course of his employment" (85 O.S. § 11) is reinforced by the fact that Lucas was paid for a full twelve hour tour, although he worked only about seven hours.

¶ 18 Triad relies on *Harris v. La Quinta*, 1997 OK 50, 937 P.2d 89, but *Harris* is inapposite to the facts of this appeal. In *Harris*, La Quinta's employee, Harris, was injured in a car accident while driving home after having worked overtime. The facts revealed that Harris was La Quinta's maintenance supervisor and working overtime was not unusual. Harris claimed that he was involved in a special task, the installation of new signs. We affirmed the Workers' Compensation Court, which had held that Harris's injury did not occur within the scope of his employment. An important distinguishing aspect of *Harris* is the fact that no transportation was required to get Harris to

ee who was on her break and routinely picked up mail then was injured when struck by a car); *Thurston Chemical Company v. Casteel*, 1955 OK ——, 285 P.2d 403 (Employee who had been told to come to work at 4:00 a.m. to clean up a storage area killed in a traffic accident on the way to work); *R.J. Allison, Inc. v. Boling*, 1943 OK ——, 192 Okla. 213, 134 P.2d 980 (employee mechanic, whom employer had picked up and taken to work at 8:00 p.m. to work on a truck, was injured when struck by car while walking home because his employer did not come back to pick him up); *Impson v. Dillard's Brown–Dunkin Co.*, 1971 OK ——, 489 P.2d 483 (employee sales lady injured when involved in an automobile accident while driving to store to take inventory on a Sunday); *Christian v. Nicor Drilling Co.*, 1982 OK 76, 653 P.2d 185 (employee oil workers, two brothers—one killed one injured, while driving their own car when they were late for their ride with their driller-supervisor, who usually provided transportation).

the task that he claimed was special because he was already at work. Here, however, Triad drove Lucas ninety miles to get him to the rigsite.

¶ 19 In *Harris,* we quoted with approval a description from *R.J. Allison, Inc. v. Boling,* 1943 OK ——, 192 Okla. 213, 134 P.2d 980, 982, of two circumstances that trigger the exception to the general rule that employee injuries occurring while going to or from work are not compensable:

> (1) when the accidental injury is sustained while going to perform, or leaving after performing, a special task, outside of his or her regular hours and at the employer's request, and (2) if the employer has agreed, as an incident to the employment, to transport the employee to and from the place of work.

[Footnotes omitted.] *Harris* at ¶ 2.

¶ 20 Lucas satisfied both exceptions we identified in *Harris,* although compliance with either would have been sufficient to place him outside the general rule that injuries sustained on the way to or from work are not compensable. Lucas's task was special, not because it differed in nature from Lucas's usual work, but because it had to be done at a time different from Lucas's usual hours, and was specially requested by Triad. The same situation existed in *Boling,* where a truck mechanic was injured while walking home after having repaired a truck between 8:00 p.m. and 11 p.m at the request of his employer, who had driven the mechanic from the mechanic's home to work to repair the truck. Triad furnished transportation to Lucas's job, in just the way the employer did in *Boling.* As Lucas's job was ninety miles from his home, Triad cannot resist the presumption that it assumed responsibility for Lucas's return trip.

■ ¶ 21 Triad also claims that because the driver of the pickup in which Lucas rode stopped for beer, this caused a "break in the employment relationship." We disagree. The other three people in the pickup truck were off-duty and stopping for beer did not affect their employment status. Triad allowed Lucas to ride home with the off-duty crew, and paid him for twelve hours instead of for the seven hours, which he actually worked. Under these circumstances, the stop cannot be said to have constituted a "break in the employment relationship" between Lucas and Triad.

CERTIORARI PREVIOUSLY GRANTED, COURT OF CIVIL APPEALS' OPINION VACATED, ORDER OF WORKERS' COMPENSATION COURT REVERSED AND MATTER REMANDED TO THE WORKERS' COMPENSATION COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

¶ 22 KAUGER, C.J., SUMMERS, V.C.J., LAVENDER, OPALA, and ALMA WILSON, JJ., concur.

¶ 23 HODGES, SIMMS, and HARGRAVE, JJ., dissent.

